**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

|  |  |  |
|---|---|---|
| CLINT LITLE and GEORGIA LITLE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.: 1:26-cv-02750 |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| THE RESIDENCES AT 401 NORTH WABASH | ) | |
| AVENUE CONDOMINIUM ASSOCIATION, | ) | |
| TRUMP CHICAGO RESIDENTIAL | ) | |
| MANAGER LLC, PETER RADZISZEWSKI, | ) | |
| JAMES DEQUILLA, SHAILENDRA SINGH, | ) | |
| and MANJULA SINGH, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiffs, Clint Litle and Georgia Litle, by and through their undersigned counsel, as and for their Complaint against Defendants, The Residences at 401 North Wabash Avenue Condominium Association (the "Condominium Association"), Trump Chicago Residential Manager LLC (the "Residential Manager"), Peter Radziszewski, James Dequilla, Shailendra Singh, and Manjula Singh, allege as follows.

**PARTIES, JURISDICTION, AND VENUE**

1. Mr. Litle is an individual who resides in Chicago, Illinois

2. Mrs. Litle is an individual who resides in Chicago, Illinois

3. The Condominium Association is an Illinois not-for-profit corporation that maintains its principal place of business in Chicago, Illinois. The Condominium Association is an entity capable of holding a legal or beneficial interest in property.

4. The Residential Manager is a Delaware limited liability company that maintains its principal place of business in Chicago, Illinois. The Residential Manager is an entity capable of

holding a legal or beneficial interest in property. On information and belief, the ultimate member of the Residential Manager is The Donald J. Trump Revocable Trust dated April 7, 2014.

5. Mr. Radziszewski is an individual, employed by the Residential Manager as the Tower Manager, who, on information and belief, resides in Chicago, Illinois.

6. Mr. Dequilla is an individual, employed by the Residential Manager as the Assistant Tower Manager, who, on information and belief, resides in Chicago, Illinois.

7. Shailendra Singh is an individual who, on information and belief, resides in Northbrook, Illinois.[1]

8. Manjula Singh is an individual who, on information and belief, resides in Northbrook, Illinois.

9. This action arises under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* (the "FHA"), and Illinois common law and statute. This Court has jurisdiction over the FHA claim pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the Illinois common law and statutory claims pursuant to 28 U.S.C. § 1367(a) because those claims are so closely related to the federal statutory claim that they form part of the same case or controversy.

10. This Court has personal jurisdiction over the Condominium Association because it conducts business in this judicial district.

11. This Court has personal jurisdiction over the Residential Manager because it conducts business in this judicial district.

12. This Court has personal jurisdiction over Mr. Radziszewski because he is domiciled in this judicial district.

---

[1] On information and belief, the Singhs are both doctors. Accordingly, to avoid confusion, Plaintiffs refer to them herein, individually, by their full names, and, collectively, as the "Singhs."

13. This Court has personal jurisdiction over Mr. Dequilla because he is domiciled in this judicial district.

14. This Court has personal jurisdiction over Shailendra Singh because he is domiciled in this judicial district.

15. This Court has personal jurisdiction over Manjula Singh because she is domiciled in this judicial district.

16. Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district.

### FACTS

17. The Condominium Association is the governing body that administers the residential condominiums at Trump Tower Chicago, located at 401 North Wabash Avenue, Chicago Illinois 60611, on behalf of all of the condominium unit owners.

18. The Residential Manager is the property management company that manages the residential condominiums at Trump Tower Chicago.

19. On August 15, 2024, Ms. Litle signed a lease to rent Unit 31F, a studio residential condominium at Trump Tower Chicago, from the unit owner, Siwei Wang, for the term of August 31, 2024 through August 31, 2025.

20. Ms. Litle resided in Unit 31F while Plaintiffs and their two children, now one year old and two years old, were in the process of moving to Chicago from Oklahoma.

21. In the early morning hours of May 24, 2025, a resident of a neighboring unit, reported to the Residential Manager that she heard raised voices in Unit 31F. An employee of the

Residential Manager investigated the complaint. He did not hear any audible disturbance from the hallway outside Unit 31F, but he spoke to Plaintiffs and informed them of the complaint.

22. Plaintiffs then continued their conversation, which was highly personal and sexual in nature, in the bathroom of Unit 31F, with the shower running in an attempt to drown out their voices and to not disturb their neighbors or their sleeping children.

23. The resident of the neighboring unit made an audio recording of Plaintiffs' conversation in the bathroom without their consent or knowledge.

24. The resident of the neighboring unit shared the audio recording with employees of the Residential Manager, who then shared the audio recording among themselves and with numerous unit owners who are members of the Condominium Association.

25. Several unit owners subsequently made offensive sexual comments to Plaintiffs that were indicative of their having listened to the audio recording.

26. Plaintiffs made repeated complaints to the Condominium Association and the Residential Manager that the resident of the neighboring unit had illegally recorded them without their knowledge and consent, and employees of the Residential Manager had illegally shared the non-consensual recording among themselves and with members of the Condominium Association.

27. In the early morning hours of June 2, 2025, the Residential Manager claimed that a resident of a neighboring unit reported that she heard raised voices in Unit 31F. An employee of the Residential Manager investigated the complaint and claimed to have heard raised voices from the hallway outside Unit 31F.

28. On June 5, 2025, Mr. Dequilla, on behalf of the Residential Manager and the Condominium Association, sent a violation notice to Ms. Wang and imposed a fine of $250.00 related to the incidents of May 24, 2025 and June 2, 2025.

4

29. On March 27, 2025, Plaintiffs signed a lease to rent Unit 58B, a one-bedroom residential condominium at Trump Tower Chicago, from the unit owners, the Singhs, for the term of June 1, 2025 through May 31, 2026, with an option to extend the term for a second year (the "Lease").

30. Under the terms of the Lease, Plaintiffs agreed to pay monthly rent of $4,200.00, a security deposit of $4,200.00, and an advance payment of $4,200.00 for the final month's rent.

31. On or about June 1, 2025, Plaintiffs and their children moved into Unit 58B.

32. On August 18, 2025, the Residential Manager claimed that a resident of a neighboring unit reported that she heard raised voices in Unit 58B. An employee of the Residential Manager investigated the complaint and claimed to have heard raised voices from the hallway immediately outside Unit 58B. The employee knocked on the door and spoke to Plaintiffs, who informed him that they did not require any assistance.

33. On August 19, 2025, Mr. Dequilla, on behalf of the Residential Manager and the Condominium Association, sent a violation notice to the Singhs and imposed a fine of $250.00 related to the incident of August 18, 2025.

34. On September 15, 2025, the Residential Manager claimed that a resident of a neighboring unit reported that she heard raised voices in Unit 58B. An employee of the Residential Manager investigated the purported complaint and heard raised voices and banging noises from the hallway immediately outside Unit 58B. The employee knocked on the door and spoke to Mrs. Litle, who informed him that she did not require any assistance.

35. On September 17, 2025, Mr. Dequilla, on behalf of the Residential Manager and the Condominium Association, sent a violation notice to the Singhs and imposed a fine of $500.00 related to the incident of September 15, 2025.

36.     On November 10, 2025, an employee of the Residential Manager who was listening from the hallway immediately outside Unit 58B heard Plaintiffs engaging in sexual relations in their living room while their children were sleeping in the bedroom. The employee knocked on the door, Mrs. Litle answered, and the employee requested that Plaintiffs make less noise.

37.     On November 11, 2025, Mr. Dequilla, on behalf of the Residential Manager and the Condominium Association, sent a violation notice to the Singhs and imposed a fine of $1,000.00 related to the incident of November 10, 2025.

38.     On November 11, 2025, an employee of the Residential Manager noticed a trash bag in the hallway outside Unit 58B that Plaintiff's housecleaner had placed there for less than an hour.

39.     On November 13, 2025, Mr. Dequilla, on behalf of the Residential Manager and the Condominium Association, sent a violation notice to the Singhs and imposed a fine of $2,000.00 related to the incident of November 11, 2025.

40.     On November 14, 2025, Mrs. Litle, with Shailendra Singh's consent and approval, sent an email to Mr. Dequilla requesting a hearing on the violation notices of November 11 and 13, 2025, at the next meeting the Board of Directors of the Condominium Association, scheduled for December 10, 2025.

41.     On November 24, 2025, Mr. Litle requested of Mr. Dequilla and the Board of Directors of the Condominium Association that the hearing be scheduled for a date after December 18, 2025, to allow Plaintiffs sufficient time to confer with legal counsel in advance of the hearing.

42.     On November 24, 2025, Mr. Litle also requested that Plaintiffs have an opportunity at the hearing to examine witnesses to the alleged noise disturbances.

43. Mr. Dequilla and the Board of Directors of the Condominium Association denied those requests.

44. At the December 10, 2025 meeting, which Plaintiffs attended, the Board of Directors of the Condominium Association voted to waive the fine of $2,000.00 related to the incident of November 11, 2025, but to require the Singhs to terminate the Lease if they engaged in any future violations of the Condominium Association's Rules and Regulations.

45. Starting after the December 10, 2025 meeting and continuing until Plaintiffs' departure from Trump Tower Chicago on February 25, 2026, Mr. Radziszewski and other employees of the Residential Manager engaged in a continuous pattern of intimidation and harassment toward Plaintiffs by frequently loitering in the hallway outside Unit 58B and in the parking garage near Plaintiffs' car when they were coming and going.

46. In January 2026, Plaintiffs and the Singhs agreed orally to extend the term of the Lease for a second year.

47. On or about January 15, 2026, an employee of the Residential Manager claimed to have heard raised voices from the hallway outside Unit 58B, knocked on the door, and spoke to Plaintiffs, who called the Chicago Police Department ("CPD") because they felt threatened by the Residential Manager's harassment. When CPD officers arrived, they spoke with employees of the Residential Manager and then forced Mrs. Litle to go to the hospital for medical evaluation, against her will, over Mr. Litle's protest, and despite Plaintiffs' having been the ones to call the CPD.

48. Although Mrs. Litle remained at the hospital only briefly, the experience caused her significant emotional distress.

49. On or about January 30, 2026, an employee of the Residential Manager heard one of Plaintiffs' children crying in Unit 58B, knocked on the door, and asked if Mrs. Litle needed

assistance with her child. The employee spoke to Mrs. Litle, who informed her that Plaintiffs' child had been crying for milk and had stopped upon receiving a bottle almost immediately.

50. On February 6, 2026, an employee of the Residential Manager purportedly heard raised voices from the hallway outside Unit 58B, knocked on the door, and spoke to Mr. Litle. The employee heard Mrs. Litle "yelling" in the bathroom because she was having a panic attack triggered by the Residential Manager's harassment. The employee demanded to speak to Mrs. Litle immediately, which made her feel even more intimidated, and he blocked Mr. Litle from closing the door. Mrs. Litle was not willing to do so, so Mr. Litle offered that she would speak to the employee later that evening. But the employee demanded that Mrs. Litle speak with him at that moment, or he would "escalate" the matter.

51. After Mrs. Litle declined to speak with the employee of the Residential Manager again, he called the CPD, the Cook County Department of Child and Family Services ("DCFS") arrived on the scene, and CPD officers stormed into Unit 58B without Plaintiffs' consent.

52. An employee of the Residential Manager stated falsely to the authorities that Plaintiffs posed a threat to their own children.

53. As a result of the employee's false statements, the CPD issued a Be On the Lookout ("BOLO") notice with respect to Plaintiffs.

54. Also, as a result of the employee's false statements, Plaintiffs had to undergo a highly emotionally distressing DCFS investigation, which included drug tests, psychiatric evaluations, and a period of mandatory family separation.

55. On February 13, 2026, an attorney for the Condominium Association emailed to the Singhs a letter demanding that, as a result of the incidents of January 15, January 16, and February 6, 2026, the Singhs commence eviction proceedings against Plaintiffs within ten days.

8

56. The account of the incidents of January 15, January 30, and February 6, 2026, in the letter of February 13, 2026, was false.[2]

57. Specifically, the letter included the following false statements of fact: (1) the January 15, 2026 incident was a "domestic dispute"; (2) during the January 30, 2026 incident, Mrs. Litle was "screaming and yelling" at her children and "acting erratic"; and (3) during the February 6, 2026 incident, "coincidentally a [DCFS] investigator arrive[d] on the scene performing an investigation into conduct related to [Plaintiffs'] children."

58. Not only does the letter include the false statement that DCFS was "coincidentally" investigating Plaintiffs' fitness as parents, but also it implies that Plaintiffs were harming their own children. This implication has caused Plaintiffs severe emotional distress.

59. On information and belief, these false statements in the letter were republications of false statements concerning Plaintiffs' fitness as parents and immoral conduct that at least one representative of the Condominium Association and the Residential Manager had published to the Condominium Association's attorney.

60. The true facts of those incidents did not justify Plaintiffs' eviction.

61. On February 13, 2026, Shailendra Singh sent an email to Plaintiffs terminating the Lease and demanding that they vacate Unit 58B by February 28, 2026.

62. The Singhs did not commence formal eviction proceedings against Plaintiffs, as the law requires of a landlord who seeks to terminate a lease.

63. Plaintiffs agreed with the Singhs to vacate Unit 58B and to terminate the Lease on February 25, 2026, provided that the Singhs refunded the advance payment of $4,200.00 for the

---

[2] The letter erroneously refers to the January 30 incident as having also occurred on January 15.

final month's rent on February 23, 2026, and that the Singhs refunded the security deposit of $4,200.00 on February 25, 2026.

64.     Plaintiffs attempted to negotiate a written contract with the Singhs, but the Singhs ultimately did not sign it.

65.     The Singhs refunded to Plaintiffs the advance payment of $4,200.00 for the final month's rent on February 23, 2026, but the Singhs refused to refund the security deposit of $4,200.00, based on the false accusation, as stated in Shailendra Singh's email of February 26, 2026, that Plaintiffs had caused in excess of $4,200.00 worth of damage to Unit 58B.

66.     In addition, on February 25, 2026, the Singhs directed a third party to change the lock of Unit 58B while some of Plaintiffs' possessions were still inside.

67.     On March 5, 2026, the Singhs placed Plaintiffs' possessions in trash bags and left them on the curb outside Trump Tower Chicago for Mr. Litle to pick up.

## COUNT I
## HOSTILE HOUSING ENVIRONMENT
## IN VIOLATION OF 42 U.S.C. §§ 3604(B) AND 3617
## AGAINST THE CONDOMINIUM ASSOCIATION, THE
## RESIDENTIAL MANAGER, MR. RADZISZEWSKI, AND MR. DEQUILLA

68.     Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs of this Complaint.

69.     Under 42 U.S.C. § 3604(b), it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race color religion, sex, familial status, or national origin."

10

70. Under 42 U.S.C. § 3617, it is unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of … any right granted or protected by section … 3604 … of this title."

71. Throughout the time of their residency at Trump Tower Chicago, the Plaintiffs endured unwelcome harassment based on their familial status as a husband and wife with young children.

72. Such unwelcome harassment included, but was not limited to, recording of Plaintiffs' private conversation—and dissemination of that recording—without their knowledge or consent, repeated investigations of purported noise disturbances that did not justify any enforcement action, repeated intrusions into their residence by employees of the Residential Manager, repeated issuance of baseless violation notices and fines against them, selective enforcement of the Condominium Associations Rules and Regulations against them, falsely reporting to DCFS that they posed a threat to their own children, demanding that the Singhs evict Plaintiffs from their condominium, and Mr. Radziszewski's and other employees frequently loitering in the hallway outside Unit 58B and in the parking garage near Plaintiffs' car when they were coming and going.

73. This harassment was so severe and pervasive that it interfered with the terms, conditions, and privileges of Plaintiffs' residency at Trump Tower Chicago.

74. Liability for this harassment, in violation of 42 U.S.C. §§ 3604(b) and 3617, may be imputed to the Condominium Association, the Residential Manager, Mr. Radziszewski, and Mr. Dequilla because all were active participants in the harassment campaign against Plaintiffs.

75. As a result of the Condominium Association's, the Residential Manager's, Mr. Radziszewski's, and Mr. Dequilla's violation of 42 U.S.C. §§ 3604(b) and 3617, Plaintiffs have

11

suffered damages, including, but not limited to, economic damages for the cost of securing alternative housing and non-economic damages for their emotional distress.

76.     Under 42 U.S.C. § 3613(c), Plaintiffs are entitled to recover actual and punitive damages and all of the court costs and reasonable attorneys' fees they incur in pursuing this claim.

**COUNT II**
**INTRUSION UPON SECLUSION**
**AGAINST THE RESIDENTIAL MANAGER**

77.     Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs of this Complaint.

78.     On May 24, 2025, the resident of a neighboring unit made an audio recording of Plaintiffs' conversation in the bathroom of Unit 31F without their consent or knowledge.

79.     The Residential Manager subsequently shared the audio recording, knowing that the neighbor had made it without Plaintiffs' knowledge or consent, with numerous unit owners who are members of the Condominium Association.

80.     Plaintiffs' conversation was highly private and sexual in nature.

81.     Plaintiffs had a legitimate expectation of privacy in the bathroom of their residence.

82.     The neighbor's recording of the Plaintiff's conversation, and the Resident Manager's subsequent dissemination of the recording, was an unauthorized intrusion into their seclusion.

83.     This intrusion would be highly offensive or objectionable to a reasonable person.

84.     The matter upon which this intrusion occurred was private.

85.     This intrusion caused Plaintiffs anguish, suffering, and emotional distress, for which they are entitled to recover damages.

12

**COUNT III**
**INTRUSION UPON SECLUSION**
**AGAINST THE RESIDENTIAL MANAGER**

86. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs of this Complaint.

87. On November 10, 2025, an employee of the Residential Manager who was listening from the hallway immediately outside Unit 58B heard Plaintiffs engaging in sexual relations in their living room while their children were sleeping in the bedroom. The employee knocked on the door, Mrs. Litle answered, and the employee requested that Plaintiffs make less noise.

88. Plaintiffs had a legitimate expectation of privacy in the living room of their residence.

89. The employee's listening to Plaintiffs engaging in sexual relations from the hallway immediately outside their residence, and his knocking on Plaintiffs' door, was an unauthorized intrusion into their seclusion.

90. This intrusion would be highly offensive or objectionable to a reasonable person.

91. The matter upon which this intrusion occurred was private.

92. This intrusion caused Plaintiffs anguish, suffering, and emotional distress, for which they are entitled to recover damages.

93. The Residential Manager is vicariously liable for this conduct of its employee because he was acting in the scope of his employment and in the Residential Manager's interest.

**COUNT IV**
**DEFAMATION**
**AGAINST THE RESIDENTIAL MANAGER**

94. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs of this Complaint.

95.     On February 6, 2026, an employee of the Residential Manager made a false statement to the authorities that Plaintiffs posed a threat to their own children.

96.     The Residential Manager's employee, knowing that statement was false, was not privileged to publish it to the authorities.

97.     The Residential Manager employee's publication of that statement damaged Plaintiffs' reputation and caused them severe emotional distress, including, but not limited to, the distress of being the subjects of a DCFS investigation.

98.     The Residential Manager is vicariously liable for this conduct of its employee because he was acting in the scope of his employment and in the Residential Manager's interest.

## COUNT V
## DEFAMATION
## AGAINST THE CONDOMINIUM ASSOCIATION

99.     Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs of this Complaint.

100.     On February 13, 2026, an attorney for the Condominium Association emailed to the Singhs a letter demanding that, as a result of the incidents of January 15, January 30, and February 6, 2026, the Singhs commence eviction proceeding against Plaintiffs within ten days.

101.     The account of the incidents of January 15, January 30, and February 6, 2026, in the letter of February 13, 2026, was false.

102.     Specifically, the letter included the following false statements: (1) the January 15, 2026 incident was a "domestic dispute"; (2) during the January 30, 2026 incident, Mrs. Litle was "screaming and yelling" at her children and "acting erratic"; and (3) during the February 6, 2026 incident, "coincidentally a [DCFS] investigator arrive[d] on the scene performing an investigation into conduct related to [Plaintiffs'] children."

14

103. Not only does the letter include the false statement that DCFS was "coincidentally" investigating Plaintiffs' fitness as parents, but also it implies that Plaintiffs were harming their own children. This implication has caused Plaintiffs severe emotional distress.

104. On information and belief, these false statements in the letter were republications of false statements that at least one representative of the Condominium Association had published to its attorney.

105. The Condominium Association's representative, knowing those statements were false, was not privileged to publish them to its attorney.

106. The Condominium Association's instructing its attorney to send the February 13, 2026 letter caused the Singhs to terminate the lease.

107. The Condominium Association's publication of those statements damaged Plaintiffs' reputation, it caused them severe emotional distress, and it caused them to suffer economic damages for the cost of securing alternative housing.

108. The Condominium Association is vicariously liable for this conduct of its representative because he was acting in in the Condominium Association's interest.

### COUNT VI
### TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATION
### AGAINST THE CONDOMINIUM ASSOCATION

109. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs of this Complaint.

110. The Lease was a valid and enforceable contract between Plaintiffs and the Singhs.

111. The Condominium Association was aware of the Lease.

112. The Condominium Association intentionally and unjustifiably induced the Singhs to terminate the Lease by instructing Condominium Association's attorney to email the Singhs a

15

letter, on February 13, 2026, demanding that the Singhs commence eviction proceeding against Plaintiffs within ten days, based on a false account of the incidents of January 15, January 30, and February 6, 2026.

113. The Condominium Association's instructing its attorney to send the February 13, 2026 letter caused the Singhs to breach the Lease by unilaterally terminating it.

114. The Condominium Association's conduct in instructing its attorney to send the February 13, 2026 letter caused Plaintiffs to suffer damages, including, but not limited to, economic damages for the cost of securing alternative housing.

**COUNT VII**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST THE CONDOMINIUM ASSOCIATION, THE**
**RESIDENTIAL MANAGER, MR. RADZISZEWSKI, AND MR. DEQUILLA**

115. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs of this Complaint.

116. The conduct of the Condominium Association, the Residential Manager, Mr. Radziszewski, and Mr. Dequilla in engaging in a severe and pervasive harassment campaign against Plaintiffs was extreme and outrageous.

117. The conduct of the Residential Manager in repeatedly intruding on Plaintiffs' seclusion and defaming them, was extreme and outrageous.

118. The conduct of the Condominium Association in tortiously interfering with the Lease was extreme and outrageous.

119. The Condominium Association, the Residential Manager, Mr. Radziszewski, and Mr. Dequilla knew there was a high probability that their conduct would cause Plaintiffs severe emotional distress.

120. The Condominium Association's, the Residential Manager's, and Mr. Dequilla's conduct did in fact cause Plaintiffs severe emotional distress, for which they are entitled to recover damages.

## COUNT VIII
### BREACH OF THE COVENANT OF QUIET ENJOYMENT
### AGAINST SHAILENDRA SINGH AND MANJULA SINGH

121. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs of this Complaint.

122. The covenant of quiet enjoyment is implied in the Lease.

123. The Singhs breached the covenant of quiet enjoyment by constructively evicting Plaintiffs through Shailendra Singh's February 13, 2026 email to Plaintiffs terminating the Lease and demanding that they vacate Unit 58B by February 28, 2026.

124. The Singhs intended to deprive Plaintiffs of the enjoyment of the premises of Unit 58B.

125. Plaintiffs vacated Unit 58B on February 25, 2026.

126. The Singhs' breach of the covenant of quiet enjoyment caused Plaintiffs to suffer damages, including, but not limited to, economic damages for the cost of securing alternative housing.

## COUNT IX
### VIOLATION OF CHICAGO MUNICIPAL CODE § 5-12-160
### AGAINST SHAILENDRA SINGH AND MANJULA SINGH

127. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs of this Complaint.

128. Chicago Municipal Code § 5-12-160 provides, "It is unlawful for any landlord or any person acting at his direction knowingly to oust or dispossess or threaten or attempt to oust or

dispossess any tenant from a dwelling unit without authority of law, by plugging, changing, adding or removing any lock or latching device….”

129. On February 25, 2026, without authority of law, Singhs directed a third party to change the lock of Unit 58B while some of Plaintiffs' possessions were still inside.

130. In accordance with Chicago Municipal Code § 5-12-160, Plaintiffs are entitled to recover from the Singhs two months' rent (i.e., $8,400.00) or twice their actual damages, whichever is greater.

131. In accordance with Chicago Municipal Code § 5-12-180, Plaintiffs are entitled to recover from the Singhs all of the court costs and reasonable attorneys' fees they incur in pursuing this claim.

**COUNT X**
**VIOLATION OF CHICAGO MUNICIPAL CODE § 5-12-080**
**AGAINST SHAILENDRA SINGH AND MANJULA SINGH**

132. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs of this Complaint.

133. Chicago Municipal Code § 5-12-080(a)(3) provides, "The name and address of the financial institution where the security deposit will be deposited shall be clearly and conspicuously disclosed in the written rental agreement signed by the tenant."

134. Chicago Municipal Code § 5-12-080(d) provides, "The landlord shall, within 45 days after the date that the tenant vacates the dwelling unit … return to the tenant the security deposit or any balance thereof and the required interest thereon; provided, however, that the landlord, or successor landlord, may deduct from such security deposit or interest due thereon for" unpaid rent or the cost of repairing any damage to the unit beyond reasonable wear and tear.

135. Prior to the commencement of the Lease, Plaintiffs paid the Singhs a Security Deposit of $4,200.00.

136. The name and address of the financial institution where the security deposit was deposited was not clearly and conspicuously disclosed in the Lease. The only information the Singhs disclosed was "BMO."

137. The Singhs have refused to refund to Plaintiffs the security deposit, based on the false accusation, as stated in Shailendra Singh's email of February 26, 2026, that Plaintiffs had caused in excess of $4,200.00 worth of damage to Unit 58B.

138. In accordance with Chicago Municipal Code § 5-12-080(f)(1), Plaintiffs are entitled to recover from the Singhs an amount equal to two times their security deposit (i.e., $8,400.00), plus interest.

139. In accordance with Chicago Municipal Code § 5-12-180, Plaintiffs are entitled to recover from the Singhs all of the court costs and reasonable attorneys' fees they incur in pursuing this claim.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

1. On Count I, awarding Plaintiffs compensatory and punitive damages against the Condominium Association, the Residential Manager, Mr. Radziszewski, and Mr. Dequilla in an amount to be proven at trial;

2. On Count I, awarding Plaintiffs their court costs and reasonable attorneys' fees against the Condominium Association, the Residential Manager, Mr. Radziszewski, and Mr. Dequilla;

3.     On Count II, awarding Plaintiffs compensatory and punitive damages against the Residential Manager in an amount to be proven at trial;

4.     On Count III, awarding Plaintiffs compensatory and punitive damages against the Residential Manager in an amount to be proven at trial;

5.     On Count IV, awarding Plaintiffs compensatory and punitive damages against the Residential Manager in an amount to be proven at trial;

6.     On Count V, awarding Plaintiffs compensatory and punitive damages against the Condominium Association in an amount to be proven at trial;

7.     On Count VI, awarding Plaintiffs compensatory and punitive damages against the Condominium Association in an amount to be proven at trial;

8.     On Count VII, awarding Plaintiffs compensatory and punitive damages against the Condominium Association, the Residential Manager, Mr. Radziszewski, and Mr. Dequilla in an amount to be proven at trial;

9.     On Count VIII, awarding Plaintiffs compensatory damages against the Singhs in an amount to be proven at trial;

10.     On Count IX, awarding Plaintiffs two months' rent (i.e., $8,400.00) or twice their actual damages, whichever is greater, against the Singhs;

11.     On Count IX, awarding Plaintiffs their court costs and reasonable attorneys' fees against the Singhs;

12.     On Count X, awarding Plaintiffs an amount equal to two times their security deposit (i.e., $8,400.00), plus interest, against the Singhs;

13.     On Count X, awarding Plaintiffs their court costs and reasonable attorneys' fees against the Singhs;

14.      Awarding Plaintiffs pre-judgment and post-judgment interest; and

15.      Awarding Plaintiffs such further relief as the Court may deem equitable and just.

Date:  March 11, 2026                   Respectfully submitted,

<u>*s/ Alexander R. Hess*</u>
Alexander R. Hess
alex@lm-law.com
Lindemann Miller Bowen LLP
25 West Main Street, Suite 500
Madison, Wisconsin 53703
(608) 239-6975

*Counsel for Plaintiffs*